## S13A0882. RUSSELL v. THE STATE.

(748 SE2d 393)

HINES, Presiding Justice.

Following the denial of his motion for new trial, as amended, Gregory John Russell appeals his convictions and sentences for felony murder and possession of a firearm during the commission of a crime in connection with the fatal shooting of his wife Windy Michelle Russell. He challenges the sufficiency of the evidence, certain communications between the trial court and the jury, and the trial court's refusal to grant a mistrial. For the reasons that follow, the challenges are without merit and we affirm.[1]

The facts construed in favor of the verdicts showed the following. On the night of April 7, 2007, Andy Pack ("Andy") and his eventual

---

[1] The crimes occurred on April 8, 2007. On September 13, 2007, a Gordon County grand jury returned an indictment against Russell, charging him with malice murder, felony murder while in the commission of aggravated assault with a deadly weapon, and possession of a firearm during the commission of a crime. He was tried before a jury July 21-25, 2008, and found guilty of the felony murder and firearms possession charge; the trial court declared a mistrial as to the malice murder charge, finding that the jury was deadlocked on it. On August 7, 2008, Russell was sentenced to life in prison for felony murder and a consecutive five years in prison for possession of a firearm during the commission of a crime; an order of nolle prosequi was entered on the malice murder count. A motion for new trial was filed on August 8, 2008, and an amended motion for new trial was filed on November 29, 2012. The motion for new trial, as amended, was denied on December 7, 2012. A notice of appeal was filed on January 7, 2013, and the case was docketed in this Court in the April 2013 term. The appeal was submitted for decision on the briefs.

wife, Rhonda Pack ("Rhonda"), arrived at the home of Rhonda's sister, Windy Russell ("Windy"), and her husband, John Russell ("Russell"). Russell had been consuming alcohol and continued to drink after their arrival; all four individuals drank alcohol during the evening. Russell and Windy often argued when they drank, sometimes resulting in violence. There was also a history of Russell making sexual advances towards Rhonda. That evening, initially both Russell and Windy seemed to be in good spirits, "getting along, dancing, and cutting up"; Windy did not appear to be depressed or upset about anything. But, later in the evening, Russell became jealous because Andy was talking to Windy instead of to him, and Russell "shoved" Andy in the chest, telling Andy that "[he] needed to talk to him before [he] talked to her." Russell challenged Andy to an arm wrestling contest. This behavior resulted in tension between Russell and Windy, and everyone decided to go to bed.

Andy and Rhonda were sleeping in the living room, which was adjacent to the bedroom where Russell and Windy had retired for the night. A short time after going to bed, Andy and Rhonda heard a "thump" coming from the nearby bedroom, as if someone had fallen down. Rhonda asked her sister if everything was alright, and Windy stated that Russell had fallen down. Later, Rhonda overheard Windy asking Russell if he still "want[ed]" or was "in love" with Rhonda. Andy and Rhonda then heard someone walk into the kitchen, and return to the bedroom which Russell and Windy were occupying. Seconds later a gunshot rang out from the bedroom.

Andy and Rhonda raced into the bedroom and observed Windy lying on her back on the floor and Russell kneeling over her and wielding a handgun. After seeing that Windy had been shot in the head, Rhonda attempted to "beat on" Russell. Andy "jerked" Russell away from Windy's body and lay down on top of Russell. Russell stated, "It was God's will. He's got to show her God's way." Russell then threatened that "if [Andy] didn't get off of him, [Andy] would be next." Andy was able to disarm Russell, and held him down until law enforcement arrived.

A neighbor who heard the gunshot and resulting commotion entered Russell's home at the direction of the 911 dispatcher to check on the welfare of the victim; the neighbor observed Windy lying on the bedroom floor, bleeding profusely from her head, and heard Russell repeatedly say, "God had told him to do it, that he had to punish her for what she had done."

Police officers arrived on the scene and placed Russell under arrest. Russell was uncooperative and had to be forced into a patrol vehicle to be transported to the police station. At the police station, Russell made the unsolicited statement, "I did it, didn't I?" and then

asked an officer to "shoot him in the back of the head." Russell did not cry or get emotional or say anything about his wife committing suicide. A search of Russell's wallet revealed a letter from Windy recently written to Russell in which Windy expressed her happiness with their relationship and regret for her past mistakes.

1. Russell contends that the State's evidence against him consisted entirely of circumstantial evidence and was not sufficient to sustain his convictions as the evidence could just as easily support a finding that Windy committed suicide. However, Russell's convictions were not based solely upon circumstantial evidence; his inculpatory statements themselves provided direct evidence of his guilt. *Daniel v. State*, 285 Ga. 406, 407 (2) (677 SE2d 120) (2009). The evidence was sufficient to enable a rational trier of fact to find Russell guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Russell contends that the trial court communicated with the jury outside his presence in several instances, thereby violating his constitutional right to be present at all critical stages of his trial. But, the contention is unavailing.

First, Russell asserts that such right was violated when the trial court spoke to the jury outside his presence just prior to both sides giving closing arguments. However, the record shows that this communication with the jury was to inform it that the State would make its initial closing argument before the lunch break, that the remainder of the closing arguments would occur after lunch, and that the jury would be getting more time than usual for lunch in order to ensure enough time for both sides to have the needed courtroom technology in place. Thus, this communication did not violate Russell's constitutional right to be present because it addressed the comfort and convenience of the jury. *Pennie v. State*, 271 Ga. 419, 421 (2) (520 SE2d 448) (1999). Even assuming arguendo that this communication went beyond matters affecting the ease of the jury, Russell's complaint still fails. Defense counsel expressly agreed with the trial court's proposal to speak with the jury in this regard, and after the trial court conveyed, in the presence of Russell and his counsel, the essence of its remarks to the jury, there was no objection to it by either Russell or his attorney; therefore, Russell acquiesced in the trial court's action. *Heywood v. State*, 292 Ga. 771 (3) (743 SE2d 12) (2013).

Russell next complains that the trial court improperly communicated with the jury outside his presence when the judge entered the jury room to answer a jury question posed to the court during jury deliberations. But, the record reveals that the trial court read the

jury's question to both sides in the presence of Russell, both the State and the defense agreed to the answer the court would give, and the court indicated it would convey that answer to the jury, and there was no objection by Russell or his counsel. Thus, there was acquiescence by Russell. Id. Russell also takes issue with the fact that during the meeting in which the trial court answered the jury's question, the jury informed the court that it wished to retire for the evening and resume deliberations the following morning; however, this request was made known in open court and there was no objection lodged. Id.

Finally, Russell complains that the trial court communicated with the jury outside his presence regarding the jury reaching verdicts on two counts but being deadlocked as to the third. But, the record discloses that the trial court informed both the defense, in the presence of Russell, and the State about the jury's partial deadlock, and its inclination to accept the verdicts on two of the counts and to declare a mistrial as to the third. As to any indication that the jury foreperson informed the trial court outside Russell's presence of the jury's progress or lack of it, Russell was silent when such possibility was brought to the attention of all in open court. Therefore, he cannot now be heard to complain of it. Id.

3. Lastly, Russell contends that the trial court erred in not granting a mistrial due to improper contact between a State's witness and jurors.

During a break in the trial, defense counsel observed the prosecuting detective in the case smoking a cigarette and conversing with some of the jurors. This was brought to the attention of the trial court, and the trial court questioned the detective and the three jurors at issue. All four testified under oath that Russell's case was not discussed at all, and that the principal topics were unrelated matters of the weather and the detective's animals. The three jurors affirmed that neither their opinions about the case nor their impartiality had been affected by the brief contact with the detective.

Certainly, Russell was entitled to be tried by a jury untainted by improper influence, and improper communication with a juror raises a presumption of prejudice to the defendant, which the State must rebut beyond a reasonable doubt. *Collins v. State*, 290 Ga. 505, 506 (3) (722 SE2d 719) (2012). But, this Court has recognized that some improper communications may be "inconsequential," and in order to disturb a jury verdict, the communication must be found to be so prejudicial that the verdict at issue is deemed to be inherently lacking in due process. Id. at 507.

Here, the presumption of prejudice was rebutted by the sworn and uncontroverted testimony of all parties directly involved supporting a determination that the irregularity was inconsequential.

Id. Thus, it must be concluded that the contact, while improper, did not contribute to the verdicts and was harmless beyond a reasonable doubt. *State v. Clements*, 289 Ga. 640, 643 (1) (715 SE2d 59) (2011). Consequently, a mistrial was not required.

*Judgments affirmed. All the Justices concur.*

DECIDED SEPTEMBER 9, 2013.

*Lee W. Fitzpatrick*, for appellant.

*Rosemary M. Greene, District Attorney, Suzanne Z. Brookshire, Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Clint C. Malcolm, Assistant Attorney General*, for appellee.